### THE FLORIDIAN.

**ROBERT BRINING & CO., Limited, et al. v. STRACHAN'S SOUTHERN S. S. CO.**

District Court, S. D. New York.
Nov. 1, 1935.

---

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Ezra G. Benedict Fox, both of New York City, of counsel), for libelant.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for claimant.

WOOLSEY, District Judge.

This case has been on trial since October 23d, and has occupied eight court days. I have taken careful notes of the evidence of the witnesses who were examined orally before me, and counsel have read to me all the depositions put in by each side, emphasizing what they deem relevant to the cause as it has now developed, and, consequently, I feel in a better position now than I shall ever be again to decide this cause. Therefore, I shall not reserve judgment.

I give the libelant an interlocutory decree, subject to the limitations hereafter mentioned.

I. This is a libel in rem against the steamship Floridian for damage to grapefruit, tangerines, celery, and cabbage shipped at Jacksonville, Fla., on or about February 20, 1929, and at Savannah, Ga., on or about February 26, 1929, and carried in four refrigerated compartments in the between decks of the steamship.

The bills of lading receipt for the packages in apparent good order and condition contain, inter alia, the following exceptions: "detention, delay * * * or any latent defect in hull, machinery or appurtenances; or unseaworthiness of the vessel even existing at the time of shipment or sailing on the voyage, providing the owners have exercised due diligence to make the vessel seaworthy * * * decay, putrefaction, change of character * * * or any loss or damage arising from inherent vice, defect or nature of the goods."

The answer bases its defense on decay due to inherent vice, and alleges due diligence to make the vessel seaworthy, and that the vessel encountered sea perils during the voyage which explained the fact that some sea water got into two of the refrigerated compartments.

It is common ground, as I understand, that when the cargo was unloaded at London on April 3, 1929, the condition of the contents of the refrigerated compartments above referred to, numbered from forward aft respectively 1, 2, 4, and 5, was as follows:

In No. 1 there were 370 crates of celery which were a total loss, and condemned by the health authorities in London, and there was decay damage to the grapefruit. There was no mildew on the grapefruit boxes in this compartment.

In No. 2 there were a thousand boxes of tangerines which were damaged to such an extent that they had to be condemned and destroyed and the grapefruit was in part decayed, and some of the boxes mildewed.

In No. 4 there were 50 hampers of cabbage which were an entire loss and were destroyed, and there was grapefruit which was found to be in part decayed. There was water in No. 4, found to the extent of two inches during the voyage, and on discharge in London some water was found and the lower tier of boxes was wet and mildewed.

In No. 5 there was decay shown in the grapefruit, which was the only cargo stowed in that compartment. There were not any mildewed boxes therein.

It is also common ground that the extent of this decay was greater than is or-

dinarily expectable, and the problem with which I am faced in this case is to determine whether the reason for that decay was, as pleaded, the inherent vice or nature of the goods, or whether it was due in whole or in part to some cause for which the shipowner is responsible.

II. The decision of the Supreme Court of the United States on December 3, 1934, in the case of The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, has changed our reading of certain bill of lading exceptions and has held, as I understand the case, that where you have an exception such as "decay," "putrefaction," "rust," or "change of character," or any exception which could be called descriptive of condition of the goods rather than of the cause of damage to them, the shipowner cannot cast the burden of going on with the evidence on the cargo owner merely by showing that the damage falls within the description named in the exception, but must go further and show that nothing which the shipowner did contributed to causing the damage.

It is regrettable that all the fact evidence in this cause was taken before the Vallescura Case was decided, for, in the light of the principle there laid down, details which have been omitted or merely glanced at, would perhaps have assumed new importance. With all the evidence, except that of expert witnesses, in deposition form, the facts have all become set and I have missed any chance of inquiring further into matters which seem to have developed some importance as the trial developed.

III. I find that there was not any fault or negligence by the shipowner in its handling of the refrigeration machinery and ventilation of the refrigerated compartments, but that the decay found in London was principally due to inherent vice and the nature of the goods.

Mr. Andrews, since 1928 consulting refrigeration engineer of the Clyde Mallory Line, called as shipowner's expert, has had a most extraordinarily well-rounded experience, especially in connection with Florida citrus fruits. He appeared to me to be a wise and moderate man, and his testimony seemed to me to be given in a less partisan manner and so to have much more value than that of the libelants' experts.

I find, reading the fact evidence in the light of Mr. Andrews' evidence, that:

A. Decay in grapefruit is *always* a fungus disease. In Florida there are fourteen or fifteen types of such disease, but only two are important. Those are stem-end decay and a green mold, which is sometimes called "blue mold," which cause 98 per cent. of decay damage in Florida grapefruit. True blue mold is a disease of California citrus fruits.

Stem-end decay is due to germs getting in through the canals at the stem of the fruit which feed the fruit during its growth; cooling down to 50 to 51 degrees stops this, and the life of the fruit can be prolonged for a couple of months at this temperature, even after it has been infected from stem-end disease.

Green mold gets in through abrasions of the skin of the fruit. Green mold spores are found in almost all groves in Florida and can be controlled by cooling down to 40 to 42 degrees.

But once one of these infections has started, even if the temperature is run down to 33 degrees, the process of decay cannot be cured but will continue although it may be somewhat arrested.

The London evidence does not show precisely the nature of the decay, but the description of it tends to show it was green mold.

B. The stages of green mold are as follows:

First, there is a small blister observed on the surface of the fruit;

Second, a fine white powder is observed in the middle of the blister; and

Third, an olive green blemish appears on the skin of the fruit which spreads from the center thereof along the surface working inward conically, and after it strikes the juice of the fruit it spreads rapidly.

Moisture will accelerate the growth of green mold, but it is to be observed that moisture would not be deposited from the air upon the fruit unless the fruit were colder than the air. The moisture which accumulates and feeds the mold comes mostly from interior juices which are tapped by the spread of the green mold spores conically inward as above described.

An excess of humidity in the air of the refrigerated compartment, however, encourages green mold decay.

C. The proper treatment of grapefruit prior to shipment as I have gathered,

especially from the evidence of Mr. Andrews, is as follows:

1. Care has to be taken in the picking of the fruit to prevent injuries either from the clippers which are used to cut the fruit from the tree or by dropping the fruit in the boxes.

2. In the packing house careful examination has to be made, for often from 15 per cent. to 18 per cent. of the fruit is found with surface injuries which will permit the spores of green mold to enter.

3. There has to be great cleanliness in the packing house and all the decayed fruit must be taken out.

4. Care must be used in handling the machinery in the packing house in which the grapefruit is washed, dried by fans, and carried by the belts used to sort the sizes.

Injuries during any of these processes open the fruit to infection from green mold.

5. It is advisable to have four or five days' seasoning of the fruit before it is put under refrigeration.

The slightest abrasion in the skin will open the fruit to green mold infection. The inspection of the boxes before loading is of 8 boxes out of 360 boxes, a standard carload, and does not extend to any of the contents of the boxes except of part of the 8 boxes inspected.

D. Carbon dioxide gas is given off in what is called the "breathing process" of the fruit, and if it is not drawn off periodically from the compartment in which the fruit is stowed there would be an accumulation of too much gas, and that would lead to the suffocation of the fruit and tend to its breakdown. This fact necessitates ventilation as well as refrigeration.

E. The temperatures of the between-deck compartments on the Floridian, as epitomized in Libelants' Exhibit 16, were maintained in accordance with what was regarded as good practice in 1929, and in substantial accordance with the letters of instruction from the shippers.

Furthermore, the refrigeration logbook shows not only the proper use of the refrigerating machinery as judged from the temperatures, but also shows that the necessary care was taken in drawing off the carbon dioxide gas above mentioned which is developed by the fruit. This gas was frequently blown off during the voyage. The percentage of this gas was never over 3 per cent. in the air of the compartments—far below the danger point, which is between 5 per cent. and 12 per cent.

F. There is not any ground for criticism of the operation of the brine circulated in the refrigeration pipes merely because it was allowed to warm up somewhat each day in order to defrost the pipes and help their conductivity. When the temperature of the brine went up to 30 degrees, the humidity would, according to Mr. Andrews, be about 90 per cent., and, after six hours, when the machine was started up again, the brine would be 2 below zero and the humidity 60 per cent; but this variation would not cause damage to grapefruit.

G. The temperature of the fruit itself is the important matter.

The fruit in a refrigerated compartment, after the situation stabilizes, is always one or two degrees higher in temperature than the air of the refrigerated compartment. This difference in temperature is called a "lag." When the temperature in the compartment goes up, the temperature of the fruit goes up very slowly, not over one-half to three-quarters of a degree in several hours. Consequently, the admission of outside air warmer than the air in the compartment would not cause damage unless it was so long continued as to raise the temperature of the air in the compartment. The temperatures in the refrigerator log show that this did not occur on the Floridian.

H. At the present time the practice in the Clyde Mallory Line, with which Mr. Andrews is connected, is to carry citrus cargoes at 40 degrees; all the lines carrying Florida citrus cargoes carry them between 38 degrees and 41 degrees. On the Porto Rico lines, which do not have the same form of citrus fruit diseases to fight as do the Florida lines, the temperature is kept at 44 degrees to 45 degrees.

I. If the grapefruit itself had a temperature of 40 degrees, and there is a humidity of 60 per cent., it will keep longer than at the same temperature with a humidity of 90 per cent. The difference is that 60 per cent. of humidity is better from the point of view of preventing decay, but that 90 per cent. is better from the point of view of keeping the fruit fresh, for it does not tend to draw on the native moisture of the fruit as the lower humidity does.

The whole matter of carriage of citrus fruit, therefore, involves a somewhat delicate balancing of advantages.

J. Tangerines are so much more tender and delicate than grapefruit that they are very seldom stored.

Florida cabbage is much more delicate than northern cabbage, for the Florida cabbage is grown in what is equivalent to hothouse conditions, for it ripens in hot weather.

Florida celery Mr. Andrews has seen in cold storage for two months, but he thought that probably the difficulty with the celery which was stowed in No. 1 compartment was due to the fact that the temperature was too high for celery. The temperature of No. 1 compartment was, however, substantially in accordance with the instructions of the shipper of the celery.

K. It is not claimed that there was any fault in the actual stowage or dunnage of the grapefruit and vegetables in the refrigerated compartments, and I think that it has been shown by a fair preponderance of the evidence that there was not any negligence in the care and custody of the cargo in so far as the operation of the refrigeration plant and the ventilation of the refrigerated space is concerned.

Some of the fruit in question here was 73 days old, some of it 60 days old, and by the end of such a period all the rots prevalent in Florida fruit had had, in Mr. Andrews' opinion, plenty of time to develop, and he says, assuming the correctness of the refrigeration temperatures— the truth of which it seems to me has not been in any way successfully impugned— there was not any explanation whatever for the extensive decay damage found in the four refrigerated compartments except that it was due to the inherent vice of the goods, and not accelerated by any fault in the care and custody of the cargo.

Therefore, the Floridian would not be liable for the damage unless it was due in part to some other matter for which she is responsible. With that aspect of the case I shall now deal.

IV. I find that the Floridian was not seaworthy when she sailed from Savannah and Jacksonville, and that in spite of the efforts which had been made to recondition her, her steering chains were not adequate to meet expectable exigencies of her voyage.

It is shown by the protest—now in evidence—which is a convenient way of referring to the matter, that she sailed on the 2d of March from Savannah after having loaded most of the cargo in question at Jacksonville and the balance at Savannah, and that on the 5th day of March her steering gear chain pin and the turnbuckles were carried away in a "moderate southwesterly gale." There was trouble with the steering gear on the following day, March 6th, when the starboard chain parted on the poop. Again on March 7th, whilst she was stopped to repair her steering gear, and therefore was not under control, a heavy sea came aboard and carried away the hand steering gear and the compass and binnacle on the poop deck. This occurred at about 10:22 a. m., and after the vessel started ahead again she had to stop at 12:42 because the starboard shelter deck fairlead block for the steering chain carried away and ripped out a section of the bulkhead adjacent to it. Relieving tackle had to be rigged and there was further damage that afternoon to the steering rod cylinder. At 9:30 that night repairs to the steering chain had been completed. The bad weather continued and, on the morning of March 8th, it was decided to make for Halifax as a port of refuge for repairs.

The vessel arrived at Halifax on the afternoon of the 9th, after having had to stop in the meantime for three-quarters of an hour to effect further steering chain repairs.

The vessel remained in Halifax under repair until the 19th and then proceeded towards London, her destination. She arrived in London on April 1st, and the cargo in question here was, as above stated, discharged on April 3d.

I find that the weather encountered was not sufficient to cause such damage as was caused here to the steering chain if it had been in proper condition.

The claimant's counsel suggests that there was nothing more which the shipowner could have done than was done in this case in connection with the reconditioning of the Floridian. I think that the answer to his suggestion—in view of the fact that the Floridian, which had been laid up for seven years at Jones' Point in the Hudson River with other Shipping Board vessels, apparently, so far as the testimony shows, had her steering chain on deck during this long period—is that

perhaps a new steering chain would have prevented the injuries which she suffered and her consequent delay.

A shipowner has to use such care in preparing his ship as will enable her to meet successfully all the expectable vicissitudes of navigating the sea, which is always inexorable and oftentimes treacherous.

The reason, it seems to me, why the seaworthiness of a vessel and the exercise of due diligence to make her seaworthy has very often to be tested pragmatically, as here, by her performance during navigation, is that there is really no better method of making any sure test. The trier of the facts has to do his best, on the evidence before him, to chancer the situation and to determine whether the weather encountered is of a kind which properly would cause damage to a seaworthy ship or to a ship in respect of which her owner had exercised the very high degree of care which is necessary to constitute due diligence to make her seaworthy.

It seems to me that I cannot from the description of the weather shown in this case, which was expectable on a transatlantic voyage in March, say that it was such weather as would have damaged a seaworthy ship as it did damage the Floridian, or that her owner had used due diligence to make her seaworthy. Hence the exception excusing unseaworthiness if due diligence was used cannot avail the claimant here.

The fact that the vessel was unseaworthy necessitated her going to Halifax and this extended her voyage by a period of at least nine days.

V. I find, therefore, that there were two causes for the decay found in this cargo on the discharge in London, for one of which (inherent vice of the cargo) the ship would not be liable; and for the other (unseaworthiness, which allowed water to get into Nos. 2 and 4 compartments and caused a nine-day delay owing to breakdown of the steering gear due to unseaworthiness) she would be liable.

The several refrigerated compartments in which the cargo in question here was stowed will now be dealt with.

A. In No. 1 compartment a slight turpentine smell was reported, due doubtless to the cause explained hereinafter at length under the discussion of compartment No. 2. It did not affect the temperatures there,

however, and I think it did not indicate a sufficient air leak to account for any damage there. There were not any mildewed boxes in No. 1 and no sea water was found therein.

The celery in that compartment was a total loss. Mr. Andrews stated quite frankly that he thought the temperature was not low enough for celery, but it was in substantial accordance with the instructions of the Arnold Fruit Company which shipped it, and, consequently, the steamship is not chargeable with negligence in regard to the refrigeration of the celery. Its decay must be attributed to inherent vice, and thus the question left open in regard to it is, to what extent the delay in the voyage caused or increased that decay and prevented its delivery in good marketable condition.

B. With regard to compartment No. 2, there was evidence that there was some sea water found in it during the voyage. The refrigerator log for March 26th shows it. There is no record of sounding to show exactly how much there was. Admittedly there was no water in this hold at London, but there the deck log records some water leaking from around a thermometer sounding pipe. In this compartment some of the boxes of grapefruit were found with mildew on them.

It was reported on March 17th and 18th, whilst the vessel was in Halifax, that there was a smell of turpentine in the No. 2 compartment which came apparently from the turpentine stowed in the lower No. 2 hold. The blower was put on the No. 2 compartment and they got rid of the smell in forty-five minutes. It is quite possible that the turpentine smell came in through one of the main ventilators which went through the compartment and were supposed to be blocked off adequately. It is probable, however, that there was some slight leak of air, although from the temperatures noted it did not affect the refrigeration in the compartment. The fact that there was such a slight leak is also illustrated by the fact that when the ventilators which passed through No. 2 refrigerated compartment were used, it was found that the temperature in the compartment rose slightly, and thereupon the caps were put back on the ventilators and the temperature was brought down again, after it had risen only about two degrees. I do not think this slight variance in temperature for the short time indicated would

have affected the situation so far as the grapefruit was concerned, but I mention this merely to show that there was evidently some slight leakage of air from the ventilators into the No. 2 compartment.

As to the boxes of tangerines which were a total loss in compartment No. 2, the situation has not been so fully developed from the point of view of expert testimony as in regard to the grapefruit. One of the libelants' witnesses testified that they should not be kept in storage more than twelve days; that they were about in the same situation in that regard as peaches. It seems to indicate that to endeavor to ship them to Europe by a slow steamer like the Floridian would result with almost certainty in a loss even if she had not been delayed by breakdown. But, again, we cannot tell to what extent the tendency to natural decay was increased by the water which found its way into the No. 2 compartment, and I think that the tangerines should be dealt with in that regard on the same basis as the grapefruit in that compartment.

C. The next compartment from forward aft was No. 4. There is a record of water having been found therein on March 27th. It was observed through the thermometer pipe, and thereupon the compartment was sounded and found to have two inches of water in it.

On discharge in London it was found that the grapefruit which was in the lower tier was wet with sea water; that the cabbage was wet with sea water; and that the latter had become a total loss.

Some of the boxes of grapefruit in this compartment were found to be mildewed.

How this water got in is a subject of some dispute. Whether it came in through the damage to the shelter deck bulkhead which was torn on March 7th by the breaking of the sheave pin of the steering chain, or whether it came in around a temperature pipe, I do not think is material in view of my findings above. I think that the presence of this water caused too much humidity in the compartment and that this would increase the tendency of the grapefruit to decay.

D. As to the condition of the No. 5 compartment, I do not think that there is any reason whatever for complaint. All the grapefruit in that compartment was the grapefruit of one shipper, De Cristina, and I think it is fairly made out from the evidence that the damage there was due to decay from inherent vice. To what extent the decay may have been increased by the delay in the voyage must be dealt with as hereinafter noted.

■ VI. Under the decision in The Vallescura, as above observed, it is necessary for the Floridian, in order to escape from liability for any part of the damage, to show by a fair preponderance of evidence what part thereof is attributable to inherent vice of the cargo for which she is not liable, and, hence, not attributable to unseaworthiness either in respect of the entry of sea water into the compartments or to the delay due to making Halifax as a port of refuge, for which she is liable.

This applies to all four of the refrigerated compartments.

A balance should be struck between such part of the damage as the ship must bear and such part as is not recoverable, and the final decree must be entered in accordance with such balance.

I shall appoint as commissioner to assess the damages herein, Russell T. Mount, Esq.

VII. This memorandum will constitute findings of fact and conclusions of law in this cause. An order to that effect may be entered either as part of the interlocutory decree, or separately when the interlocutory decree is entered.

Costs will be apportioned according to the result of the reference.

Settle such order and decree on notice.